UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/14/2014
```

-------------------------------------------------------X

SIDNEY FRANK IMPORTING CO., INC.,                :
                                                 :
                            Plaintiff,           :           13-cv-1391 (NSR)
        -against-                                :
                                                 :           OPINION AND ORDER
BEAM INC. and COOLEY DISTILLERY PLC,             :
                                                 :
                            Defendants.          :
-------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

      Plaintiff Sidney Frank Importing Co., Inc. ("SFIC" or "Plaintiff") commenced the instant

action against Beam Inc. ("Beam") and Cooley Distillery plc ("Cooley") (collectively

"Defendants") seeking monetary damages for Cooley's alleged breach of a long-term service

contract, Beam's alleged violation of common law unfair competition, and Beam's alleged

tortious interference with business relations.  Defendant now moves pursuant to Federal Rule of

Civil Procedure 12(b)(6) to dismiss Plaintiff's First Amended Complaint ("FAC") for failure to

state a claim upon which relief may be granted.  Defendant asserts: that under the express terms

of the contract, it expired when Plaintiff failed to give written notice to Cooley that it would be

extended beyond the initial period; that the unfair competition claim is duplicative of the breach

of contract claim; and that Plaintiff fails to sufficiently allege both wrongful conduct and harm

for the tortious interference claim.  For the following reasons, Defendant's motion to dismiss the

complaint is denied.

## I. FACTS ALLEGED IN PLAINTIFF'S COMPLAINT

      Plaintiff, a New York corporation, owns and imports a broad line of spirits and other

alcoholic beverages.  Plaintiff has a proven track record of building brands through substantial

investment, savvy marketing, and good relationships with wholesale distributors across the

United States.  Plaintiff's most notable brand is Jägermeister, for which it secured importing

rights in 1974.  Jägermeister became the top selling imported liqueur in the United States, thanks

to Plaintiff's efforts.  In 1997, Plaintiff created Grey Goose vodka.  Within seven years, Grey

Goose became the world's top ultra-premium vodka, before being sold for $2.3 billion.  In 2004,

Plaintiff sought to recreate similar success with a new Irish whiskey to market in the U.S.,

Michael Collins, the subject of the service contract with Cooley at issue in the instant action.

   Cooley, incorporated under Irish law, is one of only three whiskey distilleries in Ireland.

Until January 2012, Cooley was the only remaining independent distillery, producing its own

brands—Kilbeggan Irish Whiskey, Tyrconnell Single Malt Irish Whiskey, Connemara Peated

Single Malt, and Greenore Single Grain Irish Whiskey—and supplying whiskey to other

companies for their private labels.  Beam, a Delaware corporation headquartered in Illinois,

acquired Cooley and its Kilbeggan brand in 2012.  Beam is the largest spirits company based in

the U.S. and the fourth largest in the world.

   Plaintiff's Michael Collins brand was named for a legendary Irish revolutionary figure

who led the struggle for independence from the British in the early 1900s.  In 2004, Plaintiff

obtained the intellectual property rights to use the Michael Collins name and secured the support

of the Collins family.  It also began designing and sourcing the bottles and packaging.  Plaintiff

identified Cooley as the logical choice to produce the brand because of its corporate

independence and its utilization of a double distillation process, a point of distinction which

Plaintiff desired for its Michael Collins brand.  Plaintiff commissioned Cooley to develop both a

single malt and a blended Irish whiskey, and the two entered a Product Development Agreement

in May 2005.  Together the companies worked up detailed specifications for the whiskey,

finalized details of bottles, shipping cartons, and other essentials, reviewed the logistics of

shipping from Ireland to the U.S., and determined pricing.  By November 2005, Plaintiff

provided Cooley with a forecast of future demand to ensure that Cooley would have sufficient

stock over the years.  By December the parties had finalized specifications for the two products.

On January 11, 2006, Plaintiff and Cooley entered into a Services Agreement

("Agreement").[1]  Plaintiff alleges such agreements are commonly used to secure an

uninterrupted supply and ensure long-term viability.  The Agreement designated Cooley as the

exclusive supplier of Michael Collins Blended Irish Whiskey and Michael Collins Single Malt

Irish Whiskey.  Cooley undertook to manufacture the products in conformity with Plaintiff's

specifications regarding color, taste, alcohol content, and consistency; to manufacture enough to

meet the quantity specified in Plaintiff's purchase orders; and to bottle and package the products

for shipment.  Title to the whiskey itself was to belong to Cooley until collection by Plaintiff at

Cooley's premises.  Title to the Dry Goods, i.e., bottles, labels, corks, capsules, packaging

(except shipping cartons) and other necessary dry goods, was to belong to Plaintiff throughout.

The Agreement incorporated medium-term forecasts through 2011 for the blended whiskey and

through 2015 for the single malt whiskey.  It also set prices for the first three years and allowed

future increases by Cooley "upon not less than one hundred and twenty (120) days' prior written

notice to [Plaintiff] so long as any increase is reasonable and directly related to Cooley's

increased costs," which were to be "promptly documented if requested by [Plaintiff]."  (Defs.'

Ex. B (Agreement cl. 3.4).)  Further, the Agreement set up a schedule of deposits based on future

projections payable by Plaintiff to Cooley beginning in the third year, to be credited against the

purchase of the whiskey.  Portions of the deposits were to be forfeited if Plaintiff failed to meet

forecasts.

---

[1] Plaintiff incorporated the Agreement in the FAC and attached a copy thereto.

Regarding the duration of the Agreement, Clause 16.1 provided for an initial period of approximately two years, ending December 31, 2007, (*see* Agreement cl. 1.1, definition of "Contract Year"), allegedly so that Plaintiff could assess the viability of the Michael Collins brand before committing to an extended contractual term.  The initial period was to be followed by six-year renewal periods.  To renew or terminate at the end of the initial period:

> Not less than 3 months prior to expiry of the Initial Period, [Plaintiff] may give notice in writing to Cooley either:
> (a) that this Agreement will terminate on expiry of the Initial Period; or
> (b) that this Agreement will continue for further successive periods of 6 years (each a "Renewal Period").

(Agreement cl. 16.1.)  Termination of the Agreement at the end of a renewal period was allowed either:

> (a) by [Plaintiff] on giving written notice to Cooley not less than 2 years prior to expiry of the then current Renewal Period; or
> (b) by Cooley on giving written notice to [Plaintiff] not less than 3 years prior to expiry of the then current Renewal Period[.]

(Agreement cl. 16.2.)  In the event of a material breach:

> This Agreement may be terminated forthwith by either party on written notice if the other party is in material breach of the terms of the Agreement and, in the event of a breach capable of being remedied, fails to remedy the breach within sixty (60) days of receipt of notice in writing of such breach.

(Agreement cl. 16.4.)  Recognizing the possibility that Cooley, as the only independent distiller in Ireland, could be the target of acquisition by large conglomerates such as Beam, the parties agreed that:

> In circumstances where a third party obtains "control" of Cooley as defined by reference to Section 432 of the Taxes Consolidation Act, 1997, [Plaintiff] shall have the option to either:
> (a) terminate this Agreement on giving 2 years' written notice to Cooley; or
> (b) require Cooley to continue to perform its obligations under this Agreement for a further minimum period of six (6) years or until the end of the next Renewal period (whichever is later)[;]

4

(Agreement cl. 16.7), and:

> Cooley shall not at any time during the term of this Agreement divest itself of any of its assets which would have the effect of preventing or materially hindering it from fulfilling its obligations under this Agreement unless the person to whom the assets are divested agrees to enter into a novation agreement under which it assumes the rights and obligations of Cooley under this Agreement and is acceptable in all respects to [Plaintiff].

(Agreement cl. 19.8). The parties then chose to address waivers of contractual rights:

> No delay, neglect, or forbearance on the part of either party in enforcing against the other party any term or condition of this Agreement shall either be or be deemed to be a waiver or in any way prejudice any right of that party under this Agreement.

(Agreement cl. 19.2.) The Agreement "may not be modified except by an instrument in writing signed by the duly authorised representatives of the parties," (Agreement cl. 19.6). Finally, the Agreement "shall be governed by and construed in accordance with Irish law," (Agreement cl. 21.1).

Plaintiff alleges that it invested substantial money, time, and sweat equity during the relationship with Cooley, and spent approximately $14 million from 2006 through 2012 in promotions, marketing, and advertising. The FAC describes numerous purchase orders and periodic projections of demand sent to Cooley during that time. It also alleges that in July 2007 Plaintiff's and Cooley's representatives conferred regarding current inventory and Plaintiff's future production needs, and that the parties agreed to continue the contractual relationship beyond the initial term because the Michael Collins brand was developing nicely. The parties did not memorialize this extension in writing.

In January 2008, Plaintiff paid the deposit to Cooley that was required in the third year by Clause 6.1. This deposit was applied to numerous purchases of whiskey over the next several

years.  Allegedly, Cooley executives stated that further deposits and deductions from deposits for demand falling below projections would not be required, owing to the positive relationship of the two companies.  In August 2008, Plaintiff inquired as to whether Cooley anticipated pricing changes allowed by the Agreement.  After discussions, the parties agreed to an increase in January 2009.  Additionally, on September 26, 2008, Plaintiff provided Cooley with revised projections through 2013.

During 2009, Plaintiff and Cooley discussed changing the eight-year single malt to a ten- or twelve-year single malt, and they also discussed a possible repackaging to reflect a more traditional bottle of Irish whiskey.  In August 2009, Plaintiff decided to overhaul the packaging and to proceed with a ten-year single malt in lieu of the eight-year malt, as discussed.  The parties then began detailed discussions regarding pricing and anticipated future demand.  In September 2009, after careful deliberations involving Cooley personnel, Plaintiff settled upon specifications for the new ten-year single malt.  On September 2, Plaintiff forwarded its 2010 forecast to Cooley.

In the first quarter of 2010, the parties worked intensely on the details of the repackaging.  Cooley allegedly played a key role in reviewing artwork and securing bids from outside vendors.  In May 2010, the parties discussed and resolved numerous inventory issues, and reviewed Plaintiff's projected future demand.  During the summer of 2010, the parties discussed the application of the deposit Plaintiff had made in January 2008.

On January 17, 2011, Plaintiff provided Cooley with a forecast of demand for 2012.  Also in January, Plaintiff launched the repackaged Michael Collins throughout the U.S., investing heavily in advertising and promotional events in nine metropolitan markets.  As a result, demand for the repackaged product grew substantially.  Plaintiff's inventory began to run so low by

6

February 10, 2011, that the following shipment had to be sent via air.  By March 2011, sales were up 63% year-to-date.  Around that time some of Plaintiff's senior executives travelled to Ireland for a meeting with Cooley, at which the parties discussed the prospect of Plaintiff importing Cooley's brands into the United States.  Allegedly, Plaintiff agreed in principle to become the exclusive importer of these brands.

In May 2011, Cooley enlisted Plaintiff's help in fending off an unsolicited acquisition bid by William Grant & Sons Ltd. ("Grant"), one of the three largest producers of Irish whiskey in the world.  The possibility of Cooley being acquired troubled Plaintiff because of the threat posed to the success of the Michael Collins brand after having expended so much effort.  Plaintiff's counsel wrote to John Teeling, Cooley's chairman, reminding him of the change in control and asset acquisition provisions of the Agreement.  At a June 16, 2011, meeting between Cooley and Plaintiff in Plaintiff's New York offices, John Teeling (or perhaps Managing Director Jack Teeling) expressly acknowledged these contractual provisions and assured Plaintiff that he understood Grant would be bound by the terms of the Agreement.  A proposal for Plaintiff to acquire certain of Cooley's brands in order to stave off bidders fell through due to pressure from Cooley investors.  In the end, Grant elected not to pursue the acquisition.

On July 7, 2011, Plaintiff provided Cooley with a 5-year projection of its anticipated demand for Michael Collins: 196,575 cases.  This was in response to a June 18, 2011, communication from Cooley seeking estimates "to allocate current maturing whiskeys and in planning future distillation."  (FAC ¶ 198.)  Cooley's executives allegedly assured Plaintiff that Cooley could and would meet the projections.  After this point, the increased orders of Michael Collins continued.  On October 24, 2011, in response to Cooley's request for 2012 projections, Plaintiff supplied an estimate of 28,500 cases of Michael Collins.

7

As for the success of the Michael Collins brand, Plaintiff alleges that in 2011 Cooley produced and shipped over 10,200 cases of Michael Collins, a 46% increase over 2010. Plaintiff also describes numerous awards that the Michael Collins brand received throughout the years, including the following:

- 2009, Single Malt Irish Whiskey awarded Double Gold Medal, San Francisco World Spirits Competition
- 2009, Blended Irish Whiskey awarded Silver Medal, San Francisco World Spirits Competition
- 2010, Single Malt Irish Whiskey awarded Silver Medal, San Francisco World Spirits Competition
- 2011, Single Malt Irish Whiskey awarded Double Gold Medal, San Francisco World Spirits Competition
- 2011, Blended Irish Whiskey awarded Bronze Medal, San Francisco World Spirits Competition
- 2011, Blended Irish Whiskey awarded Chairman's Trophy, Ultimate Spirits Challenge (New York)
- 2012, Single Malt Irish Whiskey awarded Double Gold Medal, San Francisco World Spirits Competition
- 2012, Blended Irish Whiskey awarded Gold Medal, San Francisco World Spirits Competition
- 2012, Single Malt Irish Whiskey awarded Silver Medal, International Spirits Challenge (London)
- 2012, Blended Irish Whiskey awarded Bronze Medal, International Spirits Challenge (London).

On December 16, 2011, John Teeling of Cooley emailed Plaintiff's CEO, Lee Einsidler, advising that Beam would be announcing a plan to acquire Cooley. Beam made the announcement that day, stating that Cooley, which divided sales among its brands, private labels, and bulk sales to third-parties, had "production capacity to support substantial future growth." (FAC ¶ 220.) On December 20, 2011, Plaintiff again pressed for assurances that Cooley would honor the Agreement, but this time Teeling merely replied that he was out of the office for the holidays. On January 3, 2012, Plaintiff again contacted Teeling, who excused himself from

responding due to "integrating [his] new colleagues." (*Id.* ¶ 226.)  On January 12, 2012, after not

taking a call from Einsidler, Teeling apologized over email and stated that Einsidler "need[ed] to

talk to the Beam people not me[.]" (*Id.* ¶ 229.)  Einsidler was told he had to wait until after the

closing of the acquisition, which occurred on or about January 17, 2011.  On January 30, 2011,

after still having heard nothing, Plaintiff placed an order for 2,350 cases of Michael Collins.  At

the close of the business day, Beam replied by stating that "the material terms of the Services

Agreement have not been observed for several years and the Services Agreement has been

abandoned and rescinded." (*Id.* ¶ 235.)  In the alternative, Beam asserted that

> this letter constitutes notice of termination under Section 16.4 . . . following
> SFIC's material breach in respect of the failure to provide relevant forecasts and
> the failure to pay deposits.  SFIC's breaches . . . are not capable of being
> remedied.

(*Id.* ¶ 236.)  Beam further maintained that Cooley had been providing Michael Collins whiskey

on an ad hoc basis wherein each purchase order was filled on its own from existing inventory

and not under the terms of the Agreement.

According to the FAC, Beam's plan was to promote Cooley's Kilbeggan whiskey, also

double-distilled and sharing many characteristics with Michael Collins, at the expense of

Michael Collins in order to rival the primacy of Jameson Irish whiskey in the U.S. market.

Accordingly, Beam redirected Cooley's production for the exclusive production of Kilbeggan,

despite Cooley's contractual commitments.  This is allegedly evinced by, *inter alia*, (a) the fact

that imports to the U.S. of Kilbeggan in March 2012 were 20 times greater than in March 2011,

(b) a Beam press release on March 15, 2012, stating that Beam expected "to ship more

Kilbeggan to the U.S. in March 2012 than the total that was shipped in all of 2011 for all four

Cooley brands," (FAC ¶ 292), (c) an April 22, 2012, Irish press report that Cooley cut off

9

another private label, in which a former Cooley director and new Beam marketing director stated they were trying "to create another Jameson . . . [and trying] to make sure [they did] not run out of whiskey in three years' time," (*Id.* ¶ 293), (d) reports in the liquor industry press linking Beam's decision to terminate supply contracts with private labels to its objectives of taking on Jameson, and (e) an April 18, 2012, Irish press report detailing the decision "to increasingly allocate supplies to the Cooley brands from third-party brands," (*Id.* ¶ 295).

However, Beam initially represented to Plaintiff that Cooley would continue to produce Michael Collins. To that end, Beam arranged a meeting in Chicago on February 28, 2012, to explore a potential resolution of the issues arising from the takeover of Cooley. At or before this meeting, Beam requested detailed sales, marketing, and advertising information (i.e., route-to-market information), which Plaintiff provided in good faith. The meeting, however, ended abruptly without any progress. As he left, a senior Beam representative handed a previously drafted letter to Plaintiff's CEO Einsidler claiming that Beam encountered "supply challenges . . . due to demand relative to lack of prior forecasting" such that Beam and/or Cooley would "not be able to support Michael Collins inventory needs long term." (FAC ¶ 252.) This letter was entirely contrary to Cooley's unequivocal representations over the course of several years that it was capable of supplying enough whiskey to meet Plaintiff's needs. The pre-written letter also claimed that Cooley's cost of goods had increased considerably and it would need to increase the price of Michael Collins by 35%.

On March 5, 2012, Plaintiff's counsel wrote to Beam to express surprise at the suddenness with which Beam declared the Agreement rescinded or breached in light of the previous positive dealings with Cooley. Plaintiff's counsel also rejected Beam's contention of such rescission or breach, and expressed Plaintiff's expectation that Cooley would comply with

10

its contractual obligations.  In subsequent weeks, Plaintiff demanded to see documentation from Cooley justifying the price increase, pursuant to Clause 3.4 of the Agreement, and Defendants represented that such documentation would be forthcoming.  Defendants also led Plaintiff to believe that they would agree to a more reasonable price increase.  However on October 26, 2012, when Plaintiff placed an order for 2,352 cases of Michael Collins, Beam's representative asserted that Beam would stand firm on the 35% increase after all.

Throughout the time the parties discussed the price increase, Beam allegedly interfered with the relationships between Plaintiff and its distributors.  Beam represented to distributors Michael Collins as a failed concept not worth their time and resources.  For instance, in April 2012 an executive of one distributor—which distributed more than half the Michael Collins sold in the United States—asked Beam about the impact the Cooley acquisition would have on Michael Collins.  Beam's representative stated that Michael Collins had no future and was "not a viable brand worthy of the distributor's continued investment and support."  (FAC ¶ 282.)  The same month, a Beam executive told another distributor, "Basically, it's over for Michael Collins.[] []There is . . . no doubt Michael Collins is going away."  (*Id.* ¶ 283.)  Allegedly, Beam also sought to destroy the good will Plaintiff had developed with retailers, telling one strong supporter of Michael Collins that she "shouldn't waste her time promoting a brand that will soon be gone."  (*Id.*¶ 284.)  According to the FAC, Beam's efforts succeeded in shattering the confidence distributors and retailers once had in the viability of Michael Collins and caused them to cease carrying the brand, despite the fact that Michael Collins continued to win awards for its quality at the world's most prestigious spirits competitions.

11

## II. MOTION TO DISMISS STANDARD

On a motion to dismiss for "failure to state a claim upon which relief can be granted,"

Fed. R. Civ. P. 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007));

*accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "Although for the purposes of a

motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is]

'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S.

at 678 (quoting *Twombly*, 550 U.S. at 555). "While legal conclusions can provide the framework

of a complaint, they must be supported by factual allegations." *Id.* at 679.

When there are well-pleaded factual allegations in the complaint, "a court should assume

their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

A claim is facially plausible when the factual content pleaded allows a court "to draw a

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Ultimately, determining whether a complaint states a facially plausible claim upon which relief

may be granted must be "a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Id.* at 679. "In addition to allegations in the complaint

itself, the Court may consider documents attached as exhibits and documents incorporated by

reference in the complaint." *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 223 (S.D.N.Y. 2013)

(citing *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011); *Chapman v. N.Y. State Div. for

Youth*, 546 F.3d 230, 234 (2d Cir. 2008)).

### III. BREACH OF CONTRACT

Defendant asserts that the FAC fails to state a claim for breach of contract under Irish law.  They contend that the plain language of the Agreement precludes its continuation beyond the initial period because Plaintiff did not provide Cooley written notice as contemplated by Clause 16.1.  According to Defendants, after December 31, 2007, no contract existed despite Plaintiff's oral notification that it continued into the first renewal period, and the parties instead proceeded to order and provide Irish whiskey on an ad hoc basis.  Defendants further argue that, as no writing was in force after 2007 and as the Agreement disallowed modification except in writing, the statute of frauds precludes Plaintiff's recovery.  Plaintiff, on the other hand, asserts that Clause 16.1 is ambiguous since it permits Plaintiff to give written notification of continuation but does not preclude oral extension, that otherwise the doctrines of waiver or estoppel preclude Defendants from invoking their purported contractual right to written notice, and alternatively that an implied contract arose because the parties continued to act as though the Agreement was in force after the initial period expired.

#### A. Contract Interpretation under Irish Law

As mentioned previously, under its terms, the Agreement is to be construed in accordance with Irish law.  The Court must determine as a matter of law what Irish law is.  Fed. R. Civ. P. 44.1.  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  *Id.*  Typically, courts consider written or oral testimony.  *See* Charles Alan Wright & Arthur R. Miller, 9A *Federal Practice & Procedure* § 2444, at 344 (3d ed. 2008).  Plaintiff here provides written expert testimony via affidavit, to which is appended case law and excerpts from treatises.  (*See generally* Affidavit of Declan McGrath.)  The Court finds that the expert's

13

testimony accurately describes Irish law.[2]

In Ireland, "[t]he existence and validity of a contract . . . shall be determined by the law which would govern it . . . if the contract or term were valid."  Rome Convention on the Law Applicable to Contractual Obligations art. 8(1), *brought into force by* Contractual Obligations (Applicable Law) Act 1991 (Act No. 8/1991) (Ir.), *available at* http://www.irishstatutebook.ie/1991/en/act/pub/0008/print.html.  Thus, the choice of law provision must be honored.  The proper method of construing contractual provisions is defined by Irish courts, which routinely cite English court decisions and those of other common law jurisdictions as persuasive authority.  (McGrath Aff. ¶ 11, at 4.)

According to the Irish Supreme Court, "where the parties are in disagreement as to what a particular provision of a contract means, the task of the court is to decide what the intention of the parties was, having regard to the language used in the contract itself and the surrounding circumstances."  *Kramer v. Arnold*, [1997] 3 I.R. 43, 55, *quoted in Igote Ltd. v. Badsey Ltd.*, [2001] 4 I.R. 511, 516.  "The terms of [a particular provision] must be construed in the light of the terms of the entire contract in which it is contained and in the light of the purpose for which that contract was entered into between the parties concerned."  *O'Neill v. Beaumont Hosp. Bd.*, [1990] I.L.R.M. 419, 436 (Ir.).  Modern principles of interpretation have been described as follows:

(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as the "matrix of fact" but this phrase is, if anything, an understated description of what the

---

[2] The Court, however, disregards the expert's application of law to the Agreement.

background may include.  Subject to the requirement that it should have been reasonably available to the parties and to the exception to be next mentioned, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent.  They are admissible only in an action for rectification.  The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life.  The boundaries of this exception are in some respects unclear. . . .

(4) The meaning which a document . . . would convey to a reasonable man is not the same thing as the meaning of its words.  The meaning of words is a matter of dictionaries and grammar; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean.  The background may not merely enable the reasonable man to choose between the possible meaning of words which are ambiguous but even . . . to conclude that the parties must for whatever reason, have used the wrong words or syntax . . . .

(5) The "rule" that words should be given their "natural and ordinary meaning" reflects the commonsense proposition that *we do not easily accept that people have made linguistic mistakes*, particularly in formal documents.  On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had.  Lord Diplock made this point more vigorously when he said in *Antaios Compania S.A. v. Salen A.B.* [1985] A.C. 191, 201:

> If detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense.

*Analog Devices B.V. v. Zurich Ins. Co.*, [2005] 1 I.R. 274, 280–81 (quoting *Investors Comp. Scheme Ltd. v. W. Bromwich Bldg. Soc'y*, [1998] 1 W.L.R. 896 (H.L.) 912–13 (Lord Hoffman)) (emphasis added); *accord Emo Oil Ltd. v. Sun Alliance & London Ins. Co.*, [2009] IESC 2 (Ir.), *available at* http://www.bailii.org/ie/cases/IESC/2009/S2.html.

With respect to business commonsense, "the law . . . generally favours a commercially

15

sensible construction . . . [which] is more likely to give effect to the intention of the parties. Words are therefore interpreted in the way in which a reasonable commercial person would construe them . . . [without overly] technical interpretations [or] undue emphasis on niceties of language." *Mannai Inv. Co. v. Eagle Star Assurance Co.*, [1997] 3 All E.R. 352, 372, [1997] A.C. 749 (H.L.) (Lord Steyn), *cited in Analog Devices*, [2005] 1 I.R. at 281, *and in BNY Trust Co. (Ir.) v. Treasury Holdings*, [2007] IEHC 271, at ¶ 4.4. The Supreme Court of the United Kingdom also noted that "language used by the parties will often have more than one potential meaning. . . . [Thus, i]f there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other." *Rainy Sky S.A. v. Kookmin Bank*, [2011] UKSC 50, [2011] 1 W.L.R. 2900, 2908. However, "[w]here the parties have used unambiguous language, the court must apply it." *Id.* Thus, a court may not "force upon the words [used] a meaning which they cannot fairly bear . . . . Particularly in the field of commerce, . . . it is essential for [the parties] to be confident that they can rely on the court to enforce their contract according to its terms." *Marlan Homes Ltd. v. Walsh*, [2012] IESC 23, at ¶ 52 (Ir.) (quoting *Charter Reinsurance v. Fagan*, [1997] A.C. 313 (H.L.) 388 (Lord Mustill)).

The main issue here is whether Clause 16.1 is ambiguous. According to another common law jurisdiction, the State of New South Wales in Australia, ambiguity is present if words have "two or more plausible meanings when the context of the document is taken into account in light of any knowledge any ordinary intelligent reader of the document would bring to the meaning of it." *Burns Philp Hardware Ltd. v Howard Chia Pty Ltd.* [1987] 8 NSWLR 642, 657.

16

### B. Ambiguity of the Services Agreement

#### 1. Plain Language of Clause 16.1

The plain language of the Clause, *see Rainy Sky*, [2011] 1 W.L.R. at 2908, states that "[Plaintiff] *may* give notice in writing to Cooley either: (a) that this Agreement will terminate on expiry of the Initial Period; or (b) that this Agreement will continue for further successive periods of 6 years," (Agreement cl. 16.1) (emphasis added).  Generally, the term "may" is not used to convey a mandatory obligation.  *See McKillen v. Misland (Cyprus) Invs. Ltd.* [2013] EWCA (Civ 781 [98] (Arden, L.J.) ("I do not . . . accept the argument that the expression 'may' . . . means 'must.' . . . I can only assume that the drafter used the word 'may' deliberately."); *id.* [138] (Moore-Bick, L.J.) (finding no obligation to give notice as the clause in question "is essentially permissive in nature").  The syntax is also instructive, as "may" is used to describe Plaintiff giving notice in writing, and not to describe Plaintiff extending or terminating the Agreement.  Thus, by looking to the "ordinary meaning of the words used," *Charter Reinsurance v. Fagan*, [1997] 3 A.C. 313 (Q.B.) 384 (Eng.), as Defendants desire, Clause 16.1 means that Plaintiff had an option whether to give written notice of continuation or termination, not that Plaintiff had an option to continue or terminate but was required to do so in writing.  However, as the Agreement should be read as a whole, *see Igote Ltd. v. Badsey Ltd.*, [2001] 4 I.R. 511, 518 (Ir.), further analysis is required.

#### 2. Objective Factual Background

The Court will consider the "matrix of fact" surrounding the execution of the Agreement.  *See Analog Devices*, [2005] 1 I.R. at 281.  Such consideration must be limited to allegations of "the factual background known to the parties at or before the date of the contract, including [allegations] of the 'genesis' and objectively the 'aim' of the transaction."  *O'Neill v. Ryan (No.*

17

*3)*, [1992] 1 I.R. 166, 189 (H. Ct.) (quoting *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381 (H.L.) 1385 (Lord Wilberforce)).  The Court will disregard expressions of the parties' subjective intent. *Analog Devices*, [2005] 1 I.R. at 281.

Here, facts alleged in the FAC demonstrate an objective aim of creating a long-term services contract.  (*See* FAC ¶¶ 53–60.)  In 2004, Plaintiff and Cooley agreed to work together to develop a new Irish whiskey brand for marketing in the United States.  They worked hand in hand to develop the drinks, containers, labels, and other necessities for the new brand, and Plaintiff provided forecasts for future demand of the whiskey.  Plaintiff and Cooley memorialized their intent to develop the Michael Collins brand in a product development agreement dated May 9, 2005.  (*Id.* ¶ 56; Agreement Recital A.)  Plaintiff also alleges that a long-term services agreement with a product supplier is routine practice when developing a new brand.  (FAC ¶ 61.)

Certain provisions of the Agreement corroborate the objective aim of creating a long-term relationship governed by the Agreement.  Recital B of the Agreement expresses the commercial purpose: for Plaintiff "to engage Cooley to provide various distillation, manufacturing, blending, bottling, labelling, and packaging services in connection with" the new Michael Collins brand of Irish whiskey.  Clauses 5.1 and 5.2 contemplate the provision of initial and medium term forecasts of demand—six years for the blended Irish whiskey and ten years for the malt whiskey—by Plaintiff to Cooley, which forecasts are set forth in Schedule 1.  Clause 5.4 expresses Cooley's agreement to reserve enough liquid whiskey to meet 120% of both the initial and medium-term forecasts, and to "produce such quantities . . . as [Plaintiff] may from time to time order in accordance with the Initial Forecast and each Annual Forecast . . . ."

**3. Interpretation of Provisions in Light of Factual Background**

Having considered the factual background, the Court turns to the provision in question and the Agreement as a whole.  *See Analog Devices*, [2005] 1 I.R. at 281; *Igote Ltd.*, [2001] 4 I.R. at 518.  The language of Clause 16.1 does not address what would happen if Plaintiff gives oral notice or no notice whatsoever.  Thus, Defendants aver that neither course of action was acceptable.  However, as previously noted, Clause 16.1 uses the permissive term "may" instead of the mandatory "shall."  *See McKillen*, [2013] EWCA (Civ) 781 [98].

Other provisions of Clause 16, labeled "Commencement and Termination," also use "may" instead of "shall."  Their terms memorialize an intent that the Agreement continue in force long-term, as they allow either party to terminate the agreement in certain situations.[3] Clause 16.1 appears to conform in its use of the permissive language "may."  However, it is distinguishable because it gives Plaintiff alternatives, while for most other provisions continuation is the default rule.  (*See* Agreement cls. 16.2–.5, 16.6(b).)  Nevertheless, distinctions in syntax and choice of verbiage should not be ignored.  Whereas most other provisions in Clause 16 allow a party to terminate the contract,[4] Clause 16.1 expressly allows Plaintiff to give notice in writing.  It seems odd that the parties would have drafted Clause 16.1 differently without meaning to alter which words are affected by the word "may."  Moreover, in the context of the Agreement as a whole, it seems the interpretation that it should continue by default if Plaintiff gives oral notice of continuation makes more commercial sense than the

---

[3] *See e.g.*, Agreement cl. 16.2, (upon the expiry of the then current Renewal Period); Agreement cl. 16.3 (at any time by Plaintiff after the Initial Period where Plaintiff agrees not to supply Irish whiskey for four years); Agreement cl. 16.4 ("forthwith" if the other party is in material breach).

[4] *See* Agreement cl. 16.2 ("This Agreement may be terminated on expiry . . . ."); cl. 16.3 ("[Plaintiff] may terminate this Agreement . . . ."); cl. 16.4 ("This Agreement may be terminated . . . ."); cl. 16.5 ("Either party may terminate this Agreement . . . ."); cl. 16.6(b) ("[Plaintiff] or the Assignee may terminate this Agreement . . . ."); cl. 16.7 ("[Plaintiff] shall have the option to . . . (a) terminate this Agreement . . . .")).

interpretation that it should expire by default if Plaintiff gives such oral notice.  *See Analog Devices*, [2005] 1 I.R. at 281 (citing *Mannai*, [1997] 3 All E.R. at 372).

As to the nature of obligations in the Agreement more generally, certain provisions clearly require mandatory adherence by using the term "shall," (*e.g.*, cl. 15.1 ("[Plaintiff] *shall* provide Cooley with all necessary information, support and cooperation that may be reasonably required to enable Cooley to carry out its obligations."); cl. 7.1 ("Cooley *shall* notify [Plaintiff] and/or its designated shipping agent forthwith on completion of a Supply Order that it is ready for collection.")), while others using "may" give one party or another the option to take certain actions but do not require the particular actions, (*e.g.*, cl. 3.4(a) (after first year of first Renewal Period, "Cooley *may* increase the Fees upon no less than one hundred and twenty (120) days' prior written notice to [Plaintiff] . . . ."); cl. 12.2 ("[Plaintiff] has disclosed, and *may* throughout the duration of this Agreement continue to disclose, to Cooley information to enable Cooley to provide the Services under this Agreement.")).[5]  Clause 5.4 uses both "may" and "shall" in the same sentence, where the difference between mandatory and permissive meanings is crystal clear:

> Supply Orders may be placed in the same way as notices may be given under Clause 19.3 and shall be acknowledged and confirmed by Cooley by fax sent within 48 hours of receipt of the relevant Supply Order.

Similarly, Clause 16.1 itself uses "shall" twice in the first sentence, yet the parties chose "may" to describe Plaintiff's obligation to provide written notice of continuation.  This word choice is puzzling if the parties truly meant that Plaintiff *shall* give notice in writing that the Agreement will continue, considering that the objective aim was to produce a new Irish whiskey which was viable long-term, *O'Neill v. Ryan (No. 3)*, [1992] 1 I.R. at189, and that only Plaintiff was given

---

[5] In fact, throughout the entire Agreement the parties used "shall" over 150 times but "may" only 25 times.

the power to determine Michael Collins was not viable.[6]

As to provisions referencing Clause 16.1, Defendants point to Clause 3.4 as clearly indicating that the only means by which the Agreement could be extended was through written notice:

> The Fees may not be varied during the Initial Period and, *where the Agreement is renewed in accordance with Clause 16.1(b)*, for a further period of one (1) year following expiry of the Initial Period.

However, in setting forth the effects of termination at the expiry of a contractual period, Clause 17.2 suggests the opposite—that written notice was the only means by which the Agreement could be terminated at the end of 2007:

> Where [Plaintiff] terminates this Agreement at the end of the Initial Period (Clause 16.1(a)) . . . .

These conflicting provisions do not sufficiently clarify the mandatory or permissive nature of Plaintiff's obligation to furnish written notice of continuation.

Accordingly, the Court finds that Clause 16.1 is ambiguous. The clause has at least two plausible meanings when accounting for the entire document and the objective facts known to the parties at the time the Agreement was executed. Defendant's statute of frauds argument— that no enforceable writing exists because Plaintiff failed, due to the express terms of Clause 19.6, to modify the Agreement orally by notifying Cooley of the intent to continue the relationship—is unavailing. *See* Statute of Frauds 1695, 7 Wm. 3, c. 12, § 2 (Ir.), *available at* http://irishstatutebook.ie/1695/en/act/pub/0012/print.html. Therefore, the motion to dismiss the breach of contract claim as against Cooley must be denied. Plaintiff's arguments concerning

---

[6] No party contends that Plaintiff determined Michael Collins was not viable.

waiver,[7] estoppel,[8] and implied contract under Irish law need not be addressed at this time.

## IV. UNFAIR COMPETITION

New York courts have recognized two theories of unfair competition claims: "palming off" and misappropriation.  *See ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007).  Palming off is the sale of goods of one manufacturer as those of another.  *Id.*  Misappropriation, the theory which Plaintiff asserts here, "'concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property.'"  *Id.* at 477 (quoting *Roy Export Co. Establishment of Vaduz, Liech. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)).  Misappropriation is also described as "'taking the skills, expenditures, and labor of a competitor,'" *Roy Export*, 672 F.2d at 1105 (quoting *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 567 (1959)), "and 'misappropriating for the commercial advantage of one person . . . a benefit or "property right" belonging to another,'" *id.* (quoting *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 793 (Sup. Ct. N.Y. Cnty. 1950)).

---

[7] Interpretation of the non-waiver provision is governed by Irish law under Clause 21.1 and not by New York law. *Burns v. Del. Charter Guar. & Trust Co.*, 805 F. Supp. 2d 12, 22 (S.D.N.Y. 2008) (quoting *Lupien v. Lupien*, 68 A.D.3d 1807, 1808 (4th Dep't 2009)) ("In New York[] '[i]t is well settled that courts will enforce a choice of law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.'").

[8] The allegations support Plaintiff's argument that it detrimentally relied on the parties' course of conduct in adhering to the Agreement's terms, and on Cooley's acknowledgements that the Agreement would bind any acquirer and that Cooley would meet Plaintiff's future demand.  *See Truck & Machinery Sales Ltd. v. Marubeni Komatsu Ltd.*, [1996] 1 I.R. 12, 29 (H. Ct.) (Ir.) ("[W]here parties to a contract enter into a course of negotiations which has the effect of leading one of the parties to suppose that the strict rights arising under the contract will not be enforced, or will be kept in suspense, the person who might otherwise have enforced those rights will not be allowed to enforce them where it would be inequitable having regard to the dealings which have taken place between the parties."); *cf. Amalgamated Inv. & Prop. Co. v. Tex. Commerce Int'l Bank Ltd.*, [1982] 1 Q.B. 84 (A.C.) at 121 (Eng.) ("[I]t would be altogether unjust to allow either party to insist on the strict interpretation of the original terms of the contract—when it would be inequitable to do so, having regard to dealings which have taken place between the parties. . . . When the parties to a contract are both under a common mistake as to the meaning or effect of it— and thereafter embark on a course of dealing on the footing of that mistake—thereby replacing the original terms of the contract by a conventional basis on which they both conduct their affairs, then the original contract is replaced by the conventional basis."), *cited in Courtney v. McCarthy*, [2008] 2 I.R. 376, 389 (Ir.).

To state a claim for the misappropriation theory of unfair competition, a plaintiff must allege "that the defendant: (1) 'misappropriated the plaintiff[]'s labors, skills, expenditures, or good will'; and (2) 'displayed some element of bad faith in doing so.'" *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (S.D.N.Y. 2011) (quoting *Abe's Rooms, Inc. v. Space Hunters, Inc.*, 38 A.D.3d 690, 692 (2d Dep't 2007)).  Likelihood of confusion by the public is not an essential element in a misappropriation-based unfair competition claim.  *Beverage Mktg. USA, Inc. v. S. Beach Beverage Co.*, 20 A.D.3d 439, 439 (2d Dep't 2005) ("We disagree . . . that likelihood of confusion is an essential element of [a bad faith misappropriation] unfair competition claim."); *see also Flexitized, Inc. v. Nat'l Flexitized Corp.*, 335 F.2d 774, 782 (2d Cir. 1964) (acknowledging that extension of unfair competition tort by New York courts "resulted in the granting of relief in cases where there was no fraud on the public"); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 620 (S.D.N.Y. 2003) (finding allegation of consumer deception unnecessary for misappropriation theory); *cf. Am. Footwear Corp. v. Gen. Footwear Corp.*, 609 F.2d 655, 664 (2d Cir. 1979) (acknowledging that trademark infringement claims under Lanham Act and state law both consider "the likelihood that the consuming public will be confused as to the source of the allegedly infringing product").

Plaintiff asserts it has property rights to the whiskey supplies which Cooley produced according to Plaintiff's specifications—developed under Plaintiff's direction and at considerable expense—regarding taste, color, alcohol content and consistency.  (Pl.'s Br. 19 (citing FAC ¶¶ 57, 60, 64–65, 130).)  The supply of premium whiskey distilled to Plaintiff's specifications allegedly afforded Plaintiff a clear competitive advantage.  (Pl.'s Br. 20 (citing FAC ¶ 53 (double distillation method was a point of differentiation for Michael Collins brand)).)  Beam allegedly violated Plaintiff's property right by misappropriating the whiskey supplies for use in the

Kilbeggan brand, (*see* FAC ¶ 312), seeking "in bad faith to gain an unfair economic advantage over [Plaintiff]," (*id.* ¶ 314).

Defendants assert that the unfair competition claim is duplicative of the breach of contract claim since Kilbeggan is Cooley's brand, Cooley remains a distinct legal entity, and Plaintiff admitted at a conference that its property right in the whiskey arose by contract. However, the FAC alleges that Beam acquired the Kilbeggan brand as part of the Cooley acquisition. (FAC ¶ 25.) The Court must take that factual allegation as true for the purposes of this motion. Moreover, Plaintiff is not necessarily precluded from bringing a separate unfair competition claim. *See Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 388 F. Supp. 2d 37, 70–71 (N.D.N.Y. 2005) (simultaneous breach of contract and unfair competition claims upheld); *Astroworks*, 257 F. Supp. 2d at 616–17, 619–20 (same); *Mobius Mgmt. Sys. Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1017–18, 1023 n.11 (S.D.N.Y. 1995) (same). "[I]t is 'plain that a contracting party may be charged with a separate tort liability arising from a breach of duty distinct from, or in addition to, the breach of contract.'"[9] *Meyers v. Waverly Fabrics, Div. of Schumacher & Co.*, 65 N.Y.2d 75, 80 n.2 (1985) (quoting *N. Shore Bottling Co. v. Schmidt & Sons*, 22 N.Y.2d 171, 179 (1968)). Cooley's alleged duty under the Agreement to provide whiskey to Plaintiff in quantities specified by purchase orders, (FAC ¶ 64), is distinct from Cooley and Beam's duty not to misappropriate Plaintiff's property for their own use, (*id.* ¶ 312).

A duty not to misappropriate the whiskey supplies existed, however, only if Plaintiff had a property right in those supplies, based on Plaintiff's own efforts in creating the Michael Collins specifications. *See, e.g.*, *Astroworks*, 257 F. Supp. 2d at 619 (alleged proprietary and

---

[9] The same reasoning is even stronger when the contract and tort claims are brought against separate entities.

confidential idea as counterclaimant's property); *Demetriades v. Kaufmann*, 698 F. Supp. 521, 527 (S.D.N.Y. 1988) (design features of building interior as designer's property until building sold); *cf. Gen. Sec., Inc. v. APX Alarm Sec. Solutions, Inc.*, 647 F. Supp. 2d 207, 213–14 (N.D.N.Y. 2009) (noting no authority cited for proposition that prior acquisition of customers constitutes property right or commercial advantage).  Defendants assert that the "whiskey supplies"—which Plaintiff alleges should have been allocated to Plaintiff and other private labels, (*see* FAC ¶ 304)—were merely "unbranded bulk liquid product" that Cooley distilled for use in Kilbeggan and multiple private labels, (Defs.' Br. 14).  Thus, at that time the liquid was allegedly misappropriated, only Cooley had expended any labor, skill, expertise, or talent. (Defs.' Reply 10.)  Defendants imply that the unbranded liquid had not yet undergone some final processing to conform it to Plaintiff's specifications for Michael Collins.  Defendants, however, essentially ask the Court to determine when during the distillation process Cooley would have followed Plaintiff's specifications, a question of fact not appropriately addressed on a motion to dismiss.  *See Astroworks*, 257 F. Supp. 2d at 619 (denying motion to dismiss and leaving unresolved whether ideas were actually proprietary).  Regardless, the FAC clearly states that Beam misappropriated whiskey "that Cooley already had distilled according to [Plaintiff]'s specifications," (FAC ¶ 6), and "set aside and aged for [Plaintiff]'s use," (*id.* ¶ 279).  Thus, the FAC satisfies the first element of unfair competition: misappropriation of Plaintiff's labor and expenditures.

The second element of bad faith is also adequately alleged.  Beam abruptly ended price negotiations after securing Plaintiff's route-to-market information to jump-start its entry into the

U.S. Irish whiskey market using Plaintiff's information.[10]  (FAC ¶¶ 250–51.)  These alleged

facts, Beam's waffling as to whether sufficient whiskey would be available, (FAC ¶¶ 220, 252,

254), and Beam's misrepresentations that it would provide documentation to support its 35%

price increase, (*id.* ¶ 262), support the inference that Beam actively sought to hide from Plaintiff

that Beam was misappropriating Plaintiff's whiskey supplies.  Furthermore, Beam allegedly

planned to use Plaintiff's whiskey when it bought Cooley.  (*Id.* ¶¶ 291, 293, 295.)

Accordingly, the motion to dismiss the unfair competition claim must be denied.

## V. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

The FAC includes a claim against Beam for tortious interference with business relations.

Allegedly, in April 2012 Beam intentionally misrepresented to Plaintiff's distributors that

Michael Collins was not a viable brand to disrupt Plaintiff's supply chain by convincing those

distributors to cease purchasing whiskey from Plaintiff and selling it to retailers.  Plaintiff asserts

that Michael Collins was, in fact, extremely viable, since sales increased each year—2011 being

exceptionally good after the rollout of the new labels—and since both whiskeys continued to win

awards in 2012 after Beam acquired Cooley and interfered with Plaintiff's distributor relations.

Under New York law, to state a claim for tortious interference with business relations, a

plaintiff must allege that "(1) the plaintiff had business relations with a third party; (2) the

defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose

or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the

relationship."  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir.

2008).  Defendants here argue that dismissal of the claim is proper since Plaintiff fails to

---

[10] It seems this route-to-market information would qualify as property which gave Plaintiff an economic advantage and which Beam misappropriated after Plaintiff turned it over in good faith, believing Beam would adhere to the Agreement.  However, Plaintiff fails to allege this information was misappropriated.

adequately allege the third and fourth elements.

### A. Wrongful Means or Purpose

Where, as here, there exists no legally binding contract between the plaintiff and the third

party with whom the plaintiff has business relations, the requirement of showing wrongful means

is more stringent than for the similar cause of action known as tortious interference with contract.

Concerning this distinction,

> where there is an existing, enforceable contract and a defendant's deliberate
> interference results in a breach of that contract, a plaintiff may recover damages
> for tortious interference with contractual relations even if the defendant was
> engaged in lawful behavior. Where there has been no breach of an existing
> contract, but only interference with prospective contract rights, however, plaintiff
> must show *more culpable conduct* on the part of the defendant.

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189–90 (2004) (emphasis added) (quoting *NBT Bancorp*

*Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621 (1996)) (internal quotation marks

omitted); *accord Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F.

App'x 102, 105–06 (2d Cir. 2012).  The standard is more exacting because courts must balance a

plaintiff's expectation in establishing a contractual relationship against the "competing interest of

the interferer," *Catskill Dev.*, 547 F.3d at 132 (quoting *Guard-Life Corp. v. S. Parker Hardware*

*Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)), and the broader interest of "fostering healthy

competition," *id.* (citing *NBT Bancorp*, 87 N.Y.2d at 623).  By requiring more culpable conduct,

"[t]he implication is that, as a general rule, the defendant's conduct must amount to a crime or an

independent tort" because other conduct "will generally be 'lawful' and thus insufficiently

'culpable' to create liability for interference with . . . nonbinding economic relations."  *Carvel*

*Corp.*, 30 N.Y.3d at 190; *accord Valley Lane*, 455 F. App'x at 106.

In *Carvel Corp.*, the New York Court of Appeals recognized one exception to the general

rule "where a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs.'"  3 N.Y.3d at 190 (quoting *NBT Bancorp.*, 215 A.D.2d 990 (3d Dep't 1995), *aff'd* 87 N.Y.2d 182 (1996)).  However, the court left for another day the question of whether any other exception exists.  *Id.* at 190–91.  The court then identified other "more culpable" conduct discussed in earlier cases, explaining that an interferer would not be held liable "so long as 'the means employed are not wrongful.'"  *Id.* at 191 (quoting *Guard-Life*, 50 N.Y.2d at 191); *see also* Restatement (Second) of Torts § 768, *quoted in Guard-Life*, 50 N.Y.2d at 191 n.3.  The court explained that such "'[w]rongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract."  *Carvel Corp.*, 3 N.Y.3d at 191 (quoting *Guard-Life*, 50 N.Y.2d at 191 (citing Restatement (Second) of Torts §§ 767 cmt. c, 768 cmt. e)); *accord Lader v. Delgado*, 941 F. Supp. 2d 267, 272 (E.D.N.Y. 2013); *cf. Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 333 (S.D.N.Y. 2012) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214–15 (2d Cir. 2002)) ("[M]ethods sufficiently wrongful to be deemed tortious under New York law . . . include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure.").

Essentially, the parties disagree whether the misrepresentations alleged in the FAC are sufficient to satisfy the "wrongful means" element of the claim.[11]  Defendants assert the vast majority of recent decisions hold that a purported mistruth is no basis for a tortious interference claim.  (Defs.' Reply 5.)  However, in *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58 (2d

---

[11] Plaintiff has not alleged that Beam's purpose for interfering with the distributor relationships was solely to inflict intentional harm.

Cir. 2009), *aff'g* 551 F. Supp. 2d 164 (S.D.N.Y. 2008), which Defendants cite, (Defs.' Br. 10;

Defs.' Reply 5), the Second Circuit explained that "[a] defendant who has not committed a crime

or independent tort or acted solely out of malice may nevertheless be liable if he has employed

. . . misrepresentation," although not just *any* misrepresentation is sufficient to state a claim.

*Friedman*, 321 F. App'x at 60 (quoting *Guard-Life*, 50 N.Y.2d at 191).  Plaintiff argues that the

alleged false statements made by Beam to Plaintiff's distributors are sufficient under the

Restatement's description, which states: "A representation is fraudulent when, to the knowledge

or belief of its utterer, it is false in the sense in which it is intended to be understood by its

recipient."  Restatement (Second) of Torts § 767 cmt. c, *cited in Carvel Corp.*, 3 N.Y.3d at 191

(quoting *Guard-Life*, 50 N.Y.2d at 191).  Following this definition, Plaintiff alleges that Beam

knowingly misrepresented the Michael Collins brand to specific distributors as a failed concept

which was not viable and thus not worth their time and resources.  (*See* FAC ¶¶ 277, 282, 283.)

Beam's alleged statements thus appear sufficient to satisfy the wrongful means element.[12]

    Defendants additionally argue that the allegations of wrongful conduct are conclusory

and should be disregarded under *Twombly* and *Iqbal*.  *See, e.g.*, *DeJesus v. HF Mgmt. Servs.,*

*LLC*, 726 F.3d 85, 86, 89–90 (2d Cir. 2013) (FLSA overtime claim insufficient where plaintiff

alleged working more than 40 hours per week during "some or all weeks" of employment);

*Susskind v. Ipco Hosp. Supply Corp.*, 49 A.D.2d 915, 915 (2d Dep't 1975) ("Conclusory

allegations, such as those under review, that a defendant 'wrongfully, knowingly, intentionally,

maliciously' interfered with the consummation of a contract are clearly insufficient.").  However,

the fact that Plaintiff describes specific instances of conduct, i.e., statements made by Beam

---

[12] Beam's alleged statements did not seek to induce the distributors to buy Beam's product instead of Plaintiff's.
Therefore, the statements were not mere persuasion, which would not satisfy the wrongful means element.  *See*
*Carvel Corp.*, 3 N.Y.3d at 191.

representatives to two distributors and one retailer allegedly supportive of Michael Collins whiskey, (FAC ¶¶ 282–284), belies Defendants' argument.  In light of the details provided in the FAC (though certainly interspersed with conclusory language), and in light of the multiple cases making allowance for misrepresentations to satisfy the "wrongful means" element, the Court finds that the FAC alleges sufficient facts satisfying this element.

### B. Allegations of Injury and Causation

Defendants assert that Plaintiff fails to sufficiently allege it was actually harmed by any purported wrongful interference.  According to Defendants, Plaintiff asserts "only generalized injuries" while the factual predicate showing proximate causation is also insufficient.  (Defs.' Br. 12.)  For support, Defendants rely on *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425 (S.D.N.Y. 2012), wherein a jewelry maker alleged tortious interference by a former-executive-turned-competitor "motivated solely by malice and/or to inflict injury."  *Id.* at 451.  Aside from the obvious difference in the type of wrongful means used, *Ritani* is also distinguishable because the asserted injury was merely a breakdown of negotiations with a potential customer from whom "it [was] likely that [the plaintiff] would have obtained the financial benefit" of an initial contract and ongoing business with the purchaser.  *Id.* at 452.[13]  Here, by contrast, Plaintiff alleges that it had cultivated ongoing long-term relationships with distributors, (FAC ¶¶ 267–274), that the distributors enthusiastically promoted and distributed the Michael Collins brand nationally,

---

[13] Other cases cited in Defendants' reply are inapposite, as they address either the first element of the tortious interference claim, i.e., identifying third parties with whom a plaintiff had business relations, *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 476–78 (S.D.N.Y. 2013) (also discussing lack of wrongful means, the third element); *Learning Annex Holdings, LLC v. Gittelman*, 48 A.D.3d 211, 211 (1st Dep't 2008); *Vigoda v. DCA Prods. Plus Inc.*, 293 A.D.2d 265, 266–67 (1st Dep't 2002), the accrual of a cause of action for tortious interference with contract, *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 97 (1993) (cause of action accrues when injury sustained), and the predisposition of a third party to breach an existing contract in a tortious interference with contract case, *N. Shipping Funds I, L.L.C. v. Icon Capital Corp.*, No. 12 Civ. 3584 (JCF), 2013 WL 1500333, at *6 (S.D.N.Y. Apr. 12, 2013) (otherwise dealing with breach of contract claims).

(FAC ¶ 323), and that Beam's alleged misrepresentations caused the distributors (one of which distributed more than half of Plaintiff's brand in the U.S.) to lose confidence in the Michael Collins brand and to "withhold their support" which they had previously given, (FAC ¶ 287), resulting in economic loss.  Whereas Defendants contend that withdrawal of support is a bare recitation of injury, reading the FAC as a whole and drawing all reasonable inferences in favor of Plaintiff, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), withholding of support means the identified distributors stopped purchasing Michael Collins whiskey, (FAC ¶ 267), and ceased aggressive local promotion thereof, (*id.* ¶ 269).  As to causation, it is also reasonable to infer from the FAC that Beam's alleged misrepresentations of Michael Collins's viability, (*id.* ¶¶ 272–273), convinced these distributors to cease distribution.  Thus, the Court finds that Plaintiff sufficiently alleges quantifiable economic injury caused by Beam's actions.

Accordingly, the motion to dismiss the tortious interference claim against Beam must be denied.

## VIII. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the Complaint is DENIED. Defendants are directed to file an answer within 30 days of the date of this order.   The Clerk of Court is respectfully requested to terminate the motion (Doc. 17).

Dated: February 14, 2014
      White Plains, New York

SO ORDERED:

2/14/14

NELSON S. ROMÁN
United States District Judge

31